IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

PONCE D. HOWARD,            )
                           )
        Plaintiff,         )
                           )
v.                         )        CASE NO.: 2:16-cv-230-WKW-GMB
                           )        [WO]
HYUNDAI MOTOR              )
MANUFACTURING ALABAMA,     )
                           )
        Defendant.         )

**<u>REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE</u>**

Pursuant to 28 U.S.C. § 636(b)(1), this case was referred to the undersigned United States Magistrate Judge for review and submission of a report with recommended findings of fact and conclusions of law. Doc. 5.  On April 4, 2016, Plaintiff Ponce D. Howard, proceeding *pro se*, brought this action alleging racial discrimination during his employment with Defendant Hyundai Motor Manufacturing Alabama ("HMMA"). Doc. 1.  Howard filed an amendment to his complaint on August 31, 2016. Doc. 25.  The court considers both pleadings to be operative. *See* Doc. 33 at 2 n.1.

Now before the court is HMMA's motion for summary judgment. Doc. 51.  In addition to the summary-judgment motion, HMMA has also filed a motion for leave to supplement its evidentiary submission (Doc. 61) and a motion to strike or object to a declaration filed by Howard (Doc. 62).  With briefing complete, the motions are ripe for disposition.  After careful consideration of the parties' submissions, the applicable law, and the record as a whole, the undersigned RECOMMENDS that the motion for

summary judgment (Doc. 51) be GRANTED, and that all of Howard's claims be DISMISSED with prejudice. The undersigned further RECOMMENDS that HMMA's motion for leave to supplement its evidentiary submission (Doc. 61) be GRANTED, and that the objections contained in the motion to strike (Doc. 62) be SUSTAINED in part and OVERRULED in part.

## I.  JURISDICTION AND VENUE

The court has subject-matter jurisdiction over the claims in this action pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 2000e-5(f)(3).   The parties do not contest personal jurisdiction or venue, and the court finds adequate allegations to support both.

## II.  STANDARDS OF REVIEW

### A.    Motion to Strike

HMMA seeks an order striking portions of Howard's initial declaration (Doc. 60-1).  Under Rule 12 of the Federal Rules of Civil Procedure, the "court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f).  But declarations are not among the pleadings permitted by the Federal Rules of Civil Procedure. *See* Fed. R. Civ. P. 7(a).  Therefore, the court will not strike any portion of this filing. *See Taylor v. City of Gadsden*, 958 F. Supp. 2d 1287, 1290–91 (N.D. Ala. 2013).

However, HMMA alternatively lodged objections to the declaration. Doc. 62. Federal courts "often treat a party's motion to strike certain evidence as an objection to that evidence's admissibility." *Taylor*, 958 F. Supp. 2d at 1291; *see also Zottola v. Anesthesia Consultants of Savannah, P.C.*, 169 F. Supp. 3d 1348, 1357 (S.D. Ga. 2013)

2

("[C]ourts tend to treat motions to strike as objections to the challenged portions of affidavits."); *Ross v. Corp. of Mercer Univ.,* 506 F. Supp. 2d 1325, 1333–34 (M.D. Ga. 2007) (same).  This course of action is supported by the 2010 revision of Rule of Civil Procedure 56, which provides that a "party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2).  As the distinction is more a matter of form than substance, the court will treat HMMA's motion as containing objections under Rule 56(c)(2), and will consider the objections simultaneously with the summary-judgment motion.[1] *See Taylor*, 958 F. Supp. 2d at 1291; *Campbell v. Shinseki*, 546 F. App'x 874, 879 (11th Cir. 2013) ("The plain meaning of [the Rule 56 amendments] show[s] that objecting to the admissibility of evidence supporting a summary judgment motion is now part of summary judgment procedure, rather than a separate motion to be handled preliminarily.") (citation omitted).

## B.    Motion for Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute of material fact is genuine only if "the evidence is such that a reasonable jury could return a verdict for the

---

[1] In this case, the "objection functions much as an objection at trial, adjusted for the pretrial setting.  The burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated." Fed. R. Civ. P. 56(c)(2) advisory committee's note to 2010 amendment.

nonmoving party." *Anderson*, 477 U.S. at 248.

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine [dispute] of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). In responding to a properly supported motion for summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material fact." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Indeed, the non-movant must "go beyond the pleadings" and submit admissible evidence demonstrating "specific facts showing that there is a genuine [dispute] for trial." *Celotex*, 477 U.S. at 324 (internal quotation marks omitted). If the evidence is "merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249−50 (citations omitted).

When a district court considers a motion for summary judgment, it "must view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party, and must resolve all reasonable doubts about the facts in favor of the non-movant." *Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1274 (11th Cir. 2008) (citation and internal quotation marks omitted). The court's role is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that

inference introduces a genuine issue of material fact, then the court should not grant summary judgment." *Allen v. Bd. of Pub. Educ. for Bibb Cnty.*, 495 F.3d 1306, 1315 (11th Cir. 2007) (citation omitted).  Importantly, if the non-movant "fails to adduce evidence which would be sufficient . . . to support a jury finding for the non-movant, summary judgment may be granted." *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1370 (11th Cir. 1997) (citation omitted).

## III.  STATEMENT OF FACTS

The following facts are undisputed.  Howard is a resident of Montgomery, Alabama, and was employed by HMMA from June 2012 through February 26, 2015. Doc. 53-1 at 9.  Howard is a black male. Doc. 53-1 at 9–10.

HMMA manufactures Hyundai automobiles at its facility in Montgomery. Doc. 53-2 at 2.  HMMA's production employees, who are known as Team Members, receive direction from employees who have been designated as Team Leaders. Doc. 53-3 at 2. Team Leaders conduct an opening meeting at the beginning of each shift, make personnel substitutions for Team Members who are absent, and assist in managing the shifts. Doc. 53-3 at 2.  They do not, however, have the discretionary authority to discipline, hire, or fire employees. Doc. 53-3 at 2.  Team Leaders report to Group Leaders, who serve in a supervisory capacity and have considerable influence over personnel decisions. Doc. 53-3 at 3.  Group Leaders report to Assistant Managers, and Assistant Managers report to Managers. Doc. 53-3 at 3.

Howard was a Team Member who worked as a paint inspector. Doc. 53-1 at 16. Howard and approximately 18 to 20 coworkers shared space on the Inspection Paint

Deck ("IP Deck"), which serviced two production lines. Doc. 53-1 at 16.   In August

2013, Howard was formally disciplined after an altercation with a fellow Team Member

named Darren Walton, a black male. Doc. 53-2 at 4.   Walton alleged that Howard cursed

at him, used a homosexual slur, and threatened him. Doc. 53-2 at 4.   The allegations were

corroborated by Joshua Denham, a white male who worked on the IP Deck with Howard.

Doc. 53-2 at 4.

Team Relations, the department responsible for investigating workplace

misconduct, concluded that Howard violated HMMA's workplace violence policy. Doc.

53-3 at 5.   A violation of this policy constitutes a Serious Misconduct Offense, a class of

offenses considered to be too serious for HMMA's standard disciplinary procedure and

that could lead either to termination or to a Letter of Conditional Employment.[2] Doc. 53-

3 at 4.

As a result of the 2013 incident, Kelly Rucker, a black male who was the Human

Resources Senior Manager, exercised his discretion to issue Howard a Letter of

Conditional Employment instead of terminating his employment. Doc. 53-3 at 6.   A

Letter of Conditional Employment remains active for three years and requires the

employee to develop a corrective "action plan." Doc. 53-2 at 2–3.   A Letter of

Conditional Employment is a "last chance alternative to termination" and "specifically

warns employees that further misconduct may lead to immediate termination." Doc. 53-3

---

[2] When a Team Member is alleged to have committed a Serious Misconduct Offense, Team Relations
initiates an investigation, prepares a written memorandum, and presents the memorandum at a meeting
between members of Team Relations and Human Resources. Doc. 53-2 at 3–4.   Serious Misconduct
Offenses include harassment, discrimination, workplace violence, intentional misrepresentations, and
serious violations of performance standards. Doc. 53-2 at 3.

at 6 (internal quotation marks omitted); *see also* Doc. 53-2 at 13.

## A.    The Incident Involving Howard and Denham

On February 19, 2015, Howard was involved in an altercation with Denham on the production line.  According to Howard's narrative of events, the incident began when Denham "verbally attacked" him and mocked him for missing work the day before due to an illness.[3] Doc. 25 at 1; Doc. 53-1 at 19–20; Doc. 53-3 at 21.  Howard had asked Denham to fill in for him while he went to the restroom. Doc. 53-1 at 19; Doc. 53-3 at 21. Denham replied, "[D]amn, you just got to work." Doc. 53-3 at 21.  When Howard told Denham that he was sick, Denham replied, "[S]o f\*\*king what." Doc. 53-3 at 21. Nevertheless, Howard went to the restroom and upon his return, Chris Arnold—a white male who is a Group Leader in the Quality Control Department—handed Howard a small tool that was deformed and unsuitable for use. Doc. 51-1 at 30; Doc. 53-3 at 6–8 & 21– 22.  When Arnold told Howard that Denham gave him the tool, Howard smirked while throwing the tool down the line in the direction of a garbage can. Doc. 53-1 at 30; Doc. 53-3 at 22.  Howard did not threaten any other employee or throw the tool anywhere other than the garbage can, which was located between Howard and Denham. Doc. 53-1 at 30–31.  He only threw the tool once. Doc. 53-1 at 30–31.  After Howard threw the tool, Denham cursed at him and yelled, "[Y]our ass is fixing to go; now [you're] about to lose your job." Doc. 53-3 at 22.  According to his initial statement, Howard stayed at his work station but told Denham, "[S]omeone [is going to] get you one of these days for picking

---

[3] For Howard's account of the incident, the court relies principally on Howard's deposition but also on his statement incorporated into the Team Relations investigative report, *see* Doc. 53-3 at 21–22, because portions of Howard's deposition testimony are unclear or incomplete.

on people, but it won't be me." Doc. 53-3 at 22.  This was a reference to what Howard characterized as Denham's daily harassment of his coworkers. Doc. 53-3 at 23.   In Howard's deposition, he denied that this conversation occurred. Doc. 53-1 at 31 & 37.

According to Howard, no one said anything about his race during the incident. Doc. 53-1 at 23.  After the altercation, Arnold reported the incident to Team Relations. Doc. 25 at 1; Doc. 53-1 at 20.  Following his meeting with Team Relations, Arnold approached Howard and stated, "I ain't [sic] got nothing to do with that, man." Doc. 53-1 at 20 & 35–36.  Arnold then convened with Denham and Jeff Todd[4]—a Quality Control Team Leader—and told them what to report to Team Relations about the incident. Doc. 25 at 1; Doc. 53-1 at 20.  "[O]ne by one [they went to Team Relations] to report what Chris [Arnold] had told them to say." Doc. 25 at 1.  Denham then told Howard that Arnold and Todd were his witnesses to the altercation and suggested that Howard should procure his own witnesses. *See* Doc. 53-1 at 18 & 22–23.  Howard then decided that he needed to leave the production line. Doc. 53-1 at 23.  He asked Todd if he would cover his role on the line, and Todd responded, "F**k you.  I ain't [sic] getting nothing." Doc. 53-1 at 23.  Todd then followed Howard, continuing to bother him about his illness, while Arnold laughed at the exchange. Doc. 53-1 at 23.

## B.  The Team Relations Investigation

Denham filed a formal complaint with Team Relations against Howard. Doc. 53-3 at 6.  Jeanetta Taylor, a black female Team Relations specialist assigned to the Paint

---

[4] According to Howard, he and Todd previously had a good relationship and "talked pretty much every other day." Doc. 53-1 19.  However, Howard believes Todd aligned with Denham and Arnold in the dispute because Arnold was Todd's superior. Doc. 53-1 at 19.

Shop; Bruce White, a white male Assistant Manager; and Dennis Strobaugh, a white male Manager, opened an investigation. Doc. 53-3 at 6.   During the course of the investigation, Team Relations interviewed any employee who may have witnessed the altercation, including Howard, Denham, Arnold, Irvin Smith (a black male Team Member), and Carmen Paschal (a black female Team Member). Doc. 53-3 at 6.   Todd was not interviewed and has not been identified as a participant by any witness other than Howard. Doc. 53-3 at 7.

According to Denham, Howard asked another employee for a tool. Doc. 53-3 at 19.   After Denham gave a tool to Arnold to hand to Howard, Howard threw the tool in Denham's direction. Doc. 53-3 at 19.   Denham told Howard that Howard was "lucky" that the tool did not hit him, at which point Howard picked up the tool and threw it once again, striking Denham in the leg. Doc. 53-3 at 19.   Denham then told Howard that he was in trouble, and Howard approached Denham while making threatening gestures and saying that he would "beat" him up. Doc. 53-3 at 20.   Howard also told Denham that he was going to "come to [Denham's] house and boom," while making a gesture with his hand to mimic the firing of a gun. Doc. 53-3 at 20.   Denham claims that Howard then stated, "I will be in prison and you will be in the grave." Doc. 53-3 at 20.   At that point, Paschal and another employee approached Howard and attempted to calm him. Doc. 53-3 at 20.

Arnold stated that Denham asked him to hand a tool to Howard. Doc. 53-3 at 20. After telling Howard that Denham provided the tool, Arnold saw Denham and Howard arguing. Doc. 53-3 at 20.   Howard stood close to Denham in an apparent attempt to

intimidate him and made several threatening statements. Doc. 53-3 at 20–21.  Howard mentioned his own race during the altercation. Doc. 53-3 at 21.  Arnold then left the line to find a supervisor. Doc. 53-3 at 21.  Arnold did not see Howard make any hand gestures or throw any tools before he left. Doc. 53-3 at 20–21.

Smith stated that Howard asked for a tool and responded poorly when he received a defective tool from Arnold and Denham. Doc. 53-3 at 23.  Howard threw the tool "up the line," at which point Denham responded that "you better not hit me." Doc. 53-3 at 23. In response, Howard threw the tool again. Doc. 53-3 at 23.  Smith did not see whether the tool hit Denham, but he saw Howard approach Denham and make a threatening gesture with his left fist while stating, "[W]hat have I told you about playing with me?" Doc. 53-3 at 23.  Denham told Howard that he was going to be fired, at which point Howard threatened to kill Denham if he was fired, indicating that he knew where Denham lived. Doc. 53-3 at 23.  Howard then returned to his work station. Doc. 23-3 at 23.  According to Smith, Denham regularly provoked Howard. Doc. 23-3 at 23.

Paschal did not witness the beginning of the incident. Doc. 53-3 at 24.  The first thing she observed was Howard telling Denham, "You better leave me alone." Doc. 53-3 at 24.  When Paschal asked Howard about what was happening, Howard responded by stating that he was "tired" of Denham's harassment. Doc. 53-3 at 24.  Paschal then encouraged Howard to "just let it go," but Howard would not. Doc. 53-3 at 24; Doc. 53-1 at 32.  Paschal confirmed that Denham harassed Howard on a daily basis. Doc. 53-3 at 24.  The last thing she saw was Howard telling Denham that he was "tired" and would not "keep putting up with [Denham's harassment]." Doc. 53-3 at 24.

Based on the investigation, Team Relations concluded that Denham gave Arnold a broken tool to give to Howard as a joke. Doc. 53-3 at 7.  When Howard received the tool, he threw it at Denham but missed him. Doc. 53-3 at 7.  Howard then picked up the tool and threw it at Denham a second time, possibly hitting his leg. Doc. 53-3 at 7.  Denham responded by saying, "You are gone; that's your job." Doc. 53-3 at 7.  Howard then approached Denham and made a gesture toward him with his fist, while threatening to harm him. Doc. 53-3 at 7.  Denham instigated the altercation and harassed Howard on a daily basis. Doc. 53-3 at 25.

On February 24, 2015, Team Relations prepared a memorandum and presented the findings of the investigation to the Employment Review Committee ("ERC"), which is comprised of management-level employees from both Team Relations and Human Resources.[5] Doc. 53-2 at 3–4 & 7.  The investigation memorandum included individual responses to interview questions, but its findings rely only on facts that are corroborated by more than one individual. *See* Doc. 53-2 at 23–32.  Before reaching a determination, Team Relations compared the findings of the investigation to other instances of workplace violence in an effort to maintain consistency in its personnel decisions. Doc.

---

[5] The court acknowledges that witness statements incorporated into an investigative report may present hearsay concerns. *See, e.g.*, *United Tech. Corp. v. Mazer*, 556 F.3d 1260, 1278 (11th Cir. 2009) (holding that investigative reports may fall under the business or public records exceptions to the hearsay rule, but "placing otherwise inadmissible hearsay statements by third-parties into a government report does not make the statements admissible") (citation and internal quotation marks omitted).  However, statements that can be reduced to admissible form are properly considered at the summary-judgment stage. *See Macuba v. Deboer*, 193 F.3d 1316, 1323–24 (11th Cir. 1999) ("For example, [a] statement might be admissible because it falls within an exception to the hearsay rule, or does not constitute hearsay at all (because it is not offered to prove the truth of the matter asserted) . . . .").  Here, the court concludes that the summarized statements included in this narrative are likely to be non-hearsay as defined by the Federal Rule of Evidence 801(d), to fall within one of several exceptions to the hearsay rule, or to be admitted for purposes other than proving the truth of the matter asserted (*i.e.*, to demonstrate the effect on the listener). *See id.*

53-2 at 6.  Ultimately, after reviewing the investigation's findings, HMMA's personnel policies, and Howard's disciplinary history, Richard Neal, a white male Senior Vice President of Human Resources and Administration, decided to terminate Howard's employment. Doc. 53-2 at 6.  Neal stated that Howard's race played no role in his decision. Doc. 53-2 at 6.

Because the investigation concluded that Denham started the altercation and had harassed Howard on a daily basis, at Neal's urging Team Relations initiated an investigation into Denham's conduct on February 26, 2015. Doc. 53-2 at 6.  On March 2, Team Relations presented a memorandum summarizing its investigation into Denham's role in the altercation. Doc. 53-2 at 7.  The investigation found that Denham had harassed Howard regularly and referred to him in offensive and derogatory terms, including "sissy," "boy," and "faggot." Doc. 53-2 at 7 & 36.  As a result, Denham also had violated HMMA's policy against workplace violence and committed a Serious Misconduct Offense. Doc. 53-2 at 7.  As with Howard, after reviewing HMMA's policies, the investigative findings, and Denham's disciplinary history, Neal decided to terminate Denham's employment.[6] Doc. 53-2 at 7.  According to Neal, Denham's race played no role in the termination decision. Doc. 53-2 at 7.  The ERC concurred with Neal's decision to terminate both Howard and Denham as a result of the independent investigations. Doc. 53-2 at 7–8; Doc. 53-3 at 8–9.

---

[6] Denham, like Howard, had been issued a Letter of Conditional Employment that was active at the time of the incident. Doc. 53-2 at 7.

**C.      The Events Following the Terminations**

Howard was unemployed for eight to nine months, then worked with the City of Montgomery as a "heavy-equipment operator" before an on-the-job injury. Doc. 53-1 at 41.  After his termination, Denham worked at Hyundai Power Transformers ("HPT"). Doc. 53-1 at 10.  Because the two entities share the name "Hyundai," and because Howard struggled to find new employment during the first few months after his termination, Howard believes that HMMA transferred Denham to HPT while blocking his own attempts to seek employment elsewhere. Doc. 53-1 at 10.  However, HMMA and HPT are separate corporate entities and do not share any management or employees. Doc. 53-2 at 8.  Neither entity controls or is controlled by the other. Doc. 53-2 at 8.  There is no evidence in the record that HMMA transferred Denham or otherwise assisted him in obtaining employment.

## IV.  DISCUSSION

Before proceeding to the summary-judgment inquiry, the court must first address HMMA's motions for leave to supplement its evidentiary submission (Doc. 61) and to strike or disregard certain portions of Howard's Declaration (Doc. 62).

**A.      Motion for Leave to Supplement Evidentiary Submission**

HMMA seeks to supplement its evidentiary submission with a copy of HMMA's policy against harassment, Howard's EEOC charge of discrimination, and a supplement to a declaration submitted with its summary-judgment motion. *See generally* Doc. 61. Howard has articulated no legal basis for his opposition to HMMA's request. *See generally* Doc. 66.  Instead, Howard argues substantively against the facts HMMA's

supplemental materials demonstrate. *See* Doc. 66 at 1–3.  There is no rule prohibiting supplemental evidence at the summary-judgment stage, particularly where the evidence is introduced in response to arguments made for the first time by the non-movant in a summary-judgment brief. *See, e.g.*, *Green v. MOBIS Ala., LLC*, 995 F. Supp. 2d 1285, 1297 (M.D. Ala. 2014) (holding that the defendant could submit supplementary evidence, "especially when such evidence is introduced to respond to an argument made for the first time by [the plaintiff] in her opposition brief").  Indeed, "[s]uch supplemental evidentiary submissions are routine in this Court and throughout the Eleventh Circuit." *Id.*  Thus, the court RECOMMENDS that HMMA's Motion for Leave to Supplement its Evidentiary Submission (Doc. 61) be GRANTED.

**B.    Objections to Howard's Declaration**

HMMA objects to paragraphs 1, 4, 5, 6 through 8, and 12 of Howard's initial declaration (Doc. 60-1) "because they are inconsistent with his sworn testimony, are not based on personal knowledge, are hearsay, or are not understandable." Doc. 62 at 1–3. Howard has since submitted a supplemental declaration modifying certain portions of the first declaration. Doc. 66-1.

In responding to a motion for summary judgment, the non-moving party may rely on declarations, but they "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the . . . declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).  Evidence that does not comply with the requirements of Rule 56(c)(4) may be subject to an objection. *See Taylor*, 958 F. Supp. 2d at 1291.  The amended declaration corrects the typographical deficiencies in

paragraphs 1 and 4 that were the subject of HMMA's objections. *See* Doc. 66 at 3. Accordingly, HMMA's objections to paragraphs 1 and 4 are due to be OVERRULED as moot.

However, other portions of Howard's declarations do not comply with Rule 56(c)(4)'s requirements.   For example, several of Howard's statements contain factual assertions that lack any apparent basis in personal knowledge. *See* Fed. R. Civ. P. 56(c)(4).  The declarant must state his basis of knowledge, and "an affidavit stating only that the affiant 'believes' a certain fact exists is insufficient to defeat summary judgment by creating a genuine issue of fact about the existence of that certain fact." *Pace v. Capobianco*, 283 F.3d 1275, 1278–79 (11th Cir. 2002); *see also Reeves v. Thigpen*, 879 F. Supp. 1153, 1164 (M.D. Ala. 1995) (finding "a statement merely indicating that an affidavit is based on information and belief is insufficient as a matter of law").  Paragraph 5 of Howard's declaration states "I believe that Joshua Denham attacked me because of my race." Doc. 60-1 at 3.  Howard does not provide any basis for his personal knowledge or explanation of this belief.   Howard's later assertion that the belief is based on "personal knowledge of the totality of Denham, Arnold, and Todd's conduct" fails to remedy the deficiency. Doc. 66 at 4.   These are nothing more than unsupported statements lacking any articulable basis for Howard's knowledge of Denham's state of mind.  Accordingly, HMMA's objection to paragraph 5 of Howard's initial declaration is due to be SUSTAINED.

Paragraph 12 states, as amended, "Cindi Olsin, White Female, Sue Hall, White Female in 2013 and Valerie Knox, Black Female, Telshia Golden, Black Female in 2015

reported to team Relations that Denham had verbally harassed them in a sexual nature. HMMA has employed Telshia Golden since 2013 and she is currently employed at HMMA." Howard has not explained the relevance of a sexual-harassment allegation to a racial discrimination case, and at any rate this assertion also lacks a basis in personal knowledge. Howard argues otherwise in his response. *See* Doc. 66 at 3–4. He offers both that (1) "the events which he has personal knowledge of can be made admissible through the testimony of the individuals and other evidence" and (2) "[t]he fact that [he] was employed at HMMA during the time of the four complaints, and he came in contact with those individuals who made the complaint is sufficient." Doc. 66 at 4. The court disagrees.

Howard's contention that he acquired personal knowledge of these events due to his presence at HMMA and his unrelated encounters with the relevant individuals is vague and does little to clarify the source of his knowledge. Furthermore, in the absence of personal knowledge, merely asserting that he could marshal evidence at some later date—but not in response to the motion for summary judgment—is insufficient. *See Anderson*, 477 U.S. at 249 ("[I]n the face of the defendant's properly supported motion for summary judgment, the plaintiff [cannot] rest on his allegations . . . without any significant probative evidence tending to support the complaint.") (citation and internal quotation marks omitted). Not only has Howard failed to offer affidavits or declarations from these potential witnesses, but he has not even articulated the substance of their potential testimony beyond a thumbnail sketch. *See Celotex,* 477 U.S. at 324; *Reeves*, 879 F. Supp. at 1165. This is not enough to show his basis of personal knowledge or to

16

satisfy Rule 56(c)(4).  HMMA's objection to the statements contained in paragraph 12 is due to be SUSTAINED.

Finally, HMMA objects to paragraphs 6 through 8 of Howard's declaration, arguing that they contain conclusory statements. Doc. 62 at 3.  These statements directly address the statements of fact in HMMA's summary-judgment brief.  For example, Howard states that he "disagrees" with certain statements, that HMMA's "recitation of [certain facts] is misleading," and that other statements made by HMMA are "not factually correct." Doc. 60-1 at 3.  Because the "requirements of Rule 56 make it plain that declarations and affidavits which set forth conclusory arguments rather than statements of fact based on personal knowledge are improper," *Short v. Mando Am. Corp.*, 805 F. Supp. 2d 1246, 1265 (M.D. Ala. 2011), Howard's statements that he opposes HMMA's proffered facts—without offering any evidence of his own to contradict HMMA's assertions—do not satisfy Rule 56's requirements. *See Holifield v. Reno*, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997) ("[C]onclusory assertions . . . in the absence of [admissible] supporting evidence, are insufficient to withstand summary judgment.").  HMMA's objections to paragraphs 6, 7, and 8 are therefore due to be SUSTAINED.

## C.    Motion for Summary Judgment

Howard claims that HMMA violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, when it discriminated against him by terminating his employment on the basis of race. Doc. 25 at 2; 42 U.S.C. § 2000e–2(a)(1).  Under Title VII, Howard may prove that HMMA discriminated against him by presenting either

direct or circumstantial evidence. *See, e.g.*, *Maynard v. Bd. of Regents*, 342 F.3d 1281, 1288 (11th Cir. 2003).  Here, Howard has offered only circumstantial evidence in support his claim.

In race-based employment discrimination claims supported by circumstantial evidence, courts apply the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973).   Under this framework, the plaintiff must first establish a *prima facie* case of race discrimination. *See id.* at 802; *Brown v. Ala. Dept. of Transp.*, 597 F.3d 1160, 1174 (11th Cir. 2010).   "If a plaintiff makes the requisite showing, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions." *Brown*, 520 597 F.3d at 1174 (citing *Rojas v. Florida*, 285 F.3d 1339, 1342 (11th Cir. 2002)).   This does not mean, however, that the employer must persuade the court that it was "actually motivated by the proffered reasons." *Id.*   Finally, if the employer meets this burden, the plaintiff must demonstrate that the proffered reason is merely a pretext for unlawful discrimination. *Id.*

1. ***Prima Facie* Case**

To make out a *prima facie* case of racial discrimination based on circumstantial evidence, a plaintiff must show "(1) that he is a member of a protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) he was . . . treated less favorably than a similarly-situated individual outside his protected class." *Maynard*, 342 F.3d at 1289; *see Burke-Fowler v. Orange Cnty., Fla.*, 447 F.3d 1319, 1323 (11th Cir. 2006).   Here, the parties do not dispute that Howard is black, that he qualified for his employment at HMMA, and that HMMA terminated his employment.

18

They do disagree, however, about the final element.  Specifically, HMMA claims that Howard "has not identified a similarly-situated employee who was treated more favorably than he was." Doc. 52 at 15.

"A comparator is an employee outside of the plaintiff's protected class who is similarly situated to the plaintiff 'in all relevant respects.'" *Coar v. Pemco Aeroplex, Inc.*, 372 F. App'x 1, 3 (11th Cir. 2010) (citing *Wilson v. B/E Aerospace, Inc.,* 376 F.3d 1079, 1087 (11th Cir. 2004)).  A comparator must be disciplined differently after being "involved in or accused of the same or similar misconduct." *Holifield*, 115 F.3d at 1555. This requirement prevents "courts from second-guessing employers' reasonable decisions and confusing apples with oranges." *Burke-Fowler*, 447 F.3d at 1323 (internal quotation marks omitted).  "If a plaintiff fails to show the existence of a similarly situated employee, summary judgment is appropriate where no other evidence of discrimination is present." *Wilson*, 376 F.3d at 1092 (internal quotation marks and emphasis omitted).

Howard identifies several coworkers who could serve as comparators.[7]  Howard explicitly points to Denham as a comparator in his deposition and summary-judgment response (Doc. 53-1 at 10 & Doc. 59), but also mentions that HMMA "did not punish [Jeff Todd] and Chris Arnold, white males who were Denham's cohorts in the bullying of Plaintiff at the work site of HMMA." Doc. 66 at 9.  In both instances, Howard alleges

---

[7] In its reply brief, HMMA also addresses Howard's implied contention that Howard, through his own conduct in 2013, could serve as a comparator. Doc. 63 at 6.  Howard essentially argues that HMMA treated him differently in 2015 for an allegation of workplace misconduct against a white male—by being terminated—than he was treated in 2013 for misconduct toward a black male, which resulted only in a Letter of Conditional Employment. Doc. 59 at 9.  This argument is unavailing.  Among other reasons, Howard remains a member of the same protected class and therefore is not, by definition, an appropriate comparator.  The existence of an active Letter of Conditional Employment in 2015 also would render these two events to be dissimilar.

that white employees engaged in some form of misconduct but were treated more favorably than he was.  Thus, based on his contentions, the court will consider whether any of these three coworkers qualifies as a similarly-situated individual who was treated more favorably than Howard.

### a.    Jeff Todd and Chris Arnold

The record reflects that Todd and Arnold are both white males and therefore outside of Howard's protected class. Doc. 66 at 9.  However, other aspects of Todd's and Arnold's positions and conduct prevent them from serving as comparators.  For example, "[m]aterial differences in ranks and responsibilities are relevant for considering whether an employee is a proper comparator." *Cyprian v. Auburn Univ. Montgomery*, 799 F. Supp. 2d 1262, 1282 (M.D. Ala. 2011) (citing *Rioux*, 520 F.3d at 1269).  Howard's position and responsibilities at HMMA were different from those of both Todd and Arnold.  Todd was a Team Leader and Arnold was a Group Leader in the Quality Control Department. Doc. 53-1 at 9 & 18.  As a paint inspector, Howard was a Team Member. Doc. 53-1 at 11.  As already discussed, Team Members receive direction and instruction from Team Leaders.  Team Leaders conduct an opening meeting for the Team Members, cover for Team Members, and help manage each shift. Doc. 52 at 4.  Group Leaders have supervisory authority and "substantial input on promotion, termination, and other employment decisions." Doc. 53-3 at 3.  Thus, the contrast between Howard and Todd and Arnold in their roles and responsibilities cuts against a finding that they are comparators.

More significantly, Howard has not established that Todd's or Arnold's actions are

"nearly identical" in either quality or quantity to his own. *See Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999).  Howard claims that Arnold would often give him a "nasty look," but usually did not interact with him. Doc. 53-1 at 18–19.  Arnold also brought the tool to Howard that Howard threw at or near Denham, but otherwise played no significant role in the altercation. *See* Doc. 25 at 2.  Following the incident, Arnold and Todd "went to the side of the car where Josh was working, and they got in a little huddle up where Chris told them exactly what he just told team relations (about the incident) what to say, and they went down there simultaneously."[8] Doc. 53-1 at 20.  Howard also refers to Todd and Arnold as "cohorts" when referencing Denham's bullying and states that "Denham and his cohorts had insulted Plaintiff on a regular basis," and that they joined in on the harassment. Doc. 59 at 3 & 15.

In summary, then, Todd's and Arnold's relevant conduct amounts to ignoring Howard, giving him menacing looks, huddling to speak with Denham following the incident to fabricate a favorable version of the events, and otherwise failing to stop Denham's harassment of Howard.  In contrast, HMMA terminated Howard for threatening a coworker and throwing a tool in his direction while working under an active Letter of Conditional Employment.  This is markedly dissimilar to Todd's and Arnold's alleged conduct and history, and their disparate roles and responsibilities only buttress this conclusion.  Accordingly, Howard has failed to establish that Todd and Arnold are proper comparators.

---

[8] Howard admits he could not hear the conversation among Denham, Arnold, and Todd. Doc. 53-1 at 20.

### b.    *Joshua Denham*

HMMA contends that Denham is not similarly situated because the two employees had different disciplinary histories and conduct during the incident. Doc. 52 at 15–16. Additionally, HMMA claims that even if the two are similarly situated, they were ultimately treated the same because both were terminated as a result of their misconduct while subject to a Letter of Conditional Employment. Doc. 52 at 16.

Denham is a white male, satisfying the requirement that he must be outside of Howard's protected class to serve as a comparator. Doc. 53-1 at 17.  The two men also had similar, if not identical, duties and responsibilities. *See* Doc. 53-3 at 6 (identifying both Denham and Howard as Team Members in the Paint Department).  Denham worked as a paint inspector, and Howard testified that they "did the same thing" at HMMA. Doc. 53-1 at 22.  Additionally, Howard and Denham both had an active Letter of Conditional Employment at the time of the incident. Doc. 53-2 at 4–5 & 7.  These letters resulted from serious violations of HMMA's code of conduct and informed both employees that they could be terminated for any additional violation. Doc. 53-1 at 61.

HMMA argues that Howard and Denham are not similarly situated because the conduct which led to their letters was dissimilar and each had the letter active on his file for a different period of time. Doc. 52 at 16.  At the time of the incident, Denham's letter was 33 months old—three months shy of expiration.  Denham received the letter in 2012 based on a compliant of inappropriate behavior toward his coworkers in April of 2012. Doc. 53-2 at 7.  In contrast, Howard received his letter in 2013 after a verbal altercation involving threats of violence with another employee. Doc. 53-1 at 28.  Howard denies

that the incident happened and states that he was told that HMMA "would let it stay on your record for about eighteen months to two years." Doc 53-1 at 29.  Nevertheless, it is undisputed that the letter was active at the time of Howard's termination.

HMMA directs the court to *Silvera v. Orange County School Board*, 244 F.3d 1253 (11th Cir. 2001), claiming that its holding validates the notion of differential treatment on the basis of distinctions similar to those in this case.  In *Silvera*, the court found that an individual could not serve as a valid comparator when one subject had three prior arrests for violent conduct, while the other had none. *See id.* at 1260.  The *Silvera* court also noted the relevance of one individual's most recent arrest for a nonviolent offense having occurred two months before his termination, while the other was arrested two years prior. *Id*.  No meaningful distinction based on timing exists in the instant case because the crucial distinction under HMMA policy is whether a letter is active or inactive, not how long it has been pending. *See* Doc. 53-1 at 59.

*Silvera*'s disparity in criminal history also does not factor into the present analysis, and in any event Howard and Denham both had one specific incident of misconduct leading to their letters of conditional employment.  Moreover, Howard and Denham were terminated for the same class of offense—a Serious Misconduct Offense as a result of a violation of HMMA's workplace violence policy. Doc. 53-2 at 6–7; Doc. 53-3 at 8–9.  Thus, both Howard and Denham were on identical footing in the eyes of HMMA's disciplinary structure, both before and after the incident leading to their terminations.  That they did not behave during the February 2015 altercation in precisely the same way does not remove Denham from consideration as a comparator—Denham and Howard

23

found themselves in identical states of conditional employment, and were found to have committed equally serious misconduct violations. The court therefore concludes that Howard has established that Denham was similarly situated in all relevant respects.

Although Denham and Howard are similarly situated, this does not necessitate a finding that HMMA treated Denham more favorably than Howard. The uncontroverted evidence in the record demonstrates that both employees were terminated after HMMA concluded that each engaged in a Serious Misconduct Offense while under an active Letter of Conditional Employment. *See* Doc. 53-1. Indeed, there is no indication that HMMA treated Denham more favorably when it is undisputed that his employment was terminated after a Team Relations investigation into his conduct, just as Howard's was. And Howard has not produced any evidence that HMMA had the ability to—or did in fact—transfer Denham to HPT, an entirely separate corporate entity. Accordingly, Howard has not met his burden to demonstrate that a similarly-situated employee outside of his protected class was treated more favorably, thus falling short of the requisite showing for a *prima facie* case of race-based employment discrimination.

## 2. Burden-Shifting Framework

Even if Howard could establish a *prima facie* case, HMMA has offered a legitimate, nondiscriminatory reason for his termination. Neal, as the Senior Vice President of Human Resources and Administration at HMMA, had the discretionary authority to terminate any Team Member's employment, including Howard's. Doc. 53-2 at 6. According to Neal, HMMA held a meeting to discuss Denham's complaint against Howard on February 24, 2015. Doc. 53-2 at 5. At that meeting, Team Relations

presented a factual summary and the findings of an investigation into the incident based on interviews with other employees who witnessed it. Doc. 53-2. Neal reviewed the memorandum, which indicated that Howard threw a tool at Denham, "made some sort of fist gesture towards him," and "threatened to beat up Denham and kill him." Doc. 53-2 at 6. "After reviewing these findings, the applicable policies, and Howard's disciplinary history," Neal decided to terminate Howard's employment. Doc. 53-2 at 6.

While Howard disputes that he committed violations of HMMA rules—during both the 2013 and 2015 incidents—the court need not look behind HMMA's investigations and factfinding. "The law is clear that, even if a Title VII claimant did not in fact commit the violation with which he is charged, an employer successfully rebuts any *prima facie* case of disparate treatment by showing that it honestly believed the employee committed the violation." *Jones v. Gerwens*, 874 F.2d 1534, 1540 (11th Cir. 1989); *see Alvarez v. Royal Atlantic Developers, Inc.*, 610 F.3d 1253, 1266 (11th Cir. 2010) ("[I]t is not our role to second-guess the wisdom of an employer's business decisions—indeed the wisdom of them is irrelevant—as long as those decisions were not made with a discriminatory motive."). Neal's deposition testimony establishes that he believed Howard broke company policies. His honest belief that Howard threatened violence against another employee while subject to an active Letter of Conditional Employment constitutes a legitimate and nondiscriminatory reason for Howard's termination. Therefore, HMMA has satisfied its burden at this stage of the *McDonnell-Douglas* analysis.

Because HMMA has articulated a legitimate, nondiscriminatory reason for

Howard's termination, the burden shifts to Howard to submit sufficient evidence suggesting that HMMA's proffered reason was pretextual. "To show pretext, a plaintiff must show that the employer's offered reason was not the true reason for its decision, 'either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly showing that the employer's proffered explanation is unworthy of credence.'" *Lucy v. Georgia-Pac. Corrugated I, LLC*, 497 F. App'x 870, 871 (11th Cir. 2012) (quoting *Jackson v. St. of Ala. St. Tenure Comm'n*, 405 F.3d 1276, 1289 (11th Cir. 2005)).  A proffered explanation is unworthy of credence when "the plaintiff has demonstrated . . . weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons." *Combs v. Plantation Patterns,* 106 F.3d 1519, 1538 (11th Cir. 1997) (internal quotation marks omitted).  Pretext cannot be established by the plaintiff's own evaluation and opinion, *Standard v. A.B.E.L. Servs., Inc.,* 161 F.3d 1318, 1332–33 (11th Cir. 1998), or by "simply quarreling with the wisdom of [the proffered] reason." *Chapman v. AI Transport,* 229 F.3d 1012, 1030 (11th Cir. 2000).

"When, as here, the employer justifies the adverse employment decision by relying on a work rule violation, a plaintiff may prove pretext by proffering 'evidence (1) that [he or] she did not violate the cited work rule, or (2) that if [he or] she did violate the rule, other employees outside the protected class, who engaged in similar acts, were not similarly treated.'" *Williams v. Ala. Dep't of Transp.*, 509 F. Supp. 2d 1046, 1058 (M.D. Ala. 2007) (quoting *Damon v. Fleming Supermarkets of Fla., Inc.,* 196 F.3d 1354, 1362 (11th Cir. 1999)).  In response to HMMA's proffered justification for his termination,

Howard does not provide evidence showing he did not violate workplace rules and instead states that pretext is evident from the fact that he received more severe punishment following the 2015 incident—in which the alleged victim was white—than for his previous incident of misconduct involving a black victim. Doc. 59 at 14. However, it is undisputed that Howard was not subject to a Letter of Conditional Employment at the time of the 2013 incident.  Indeed, that incident prompted the letter on file at the time of the 2015 incident.   Beyond conclusory assertions and speculation, Howard has directed the court to no other direct or indirect evidence of a discriminatory motive on the part of HMMA.   And Howard has failed to demonstrate how or why HMMA's legitimate, nondiscriminatory reason for his termination is unworthy of credence.  Accordingly, Howard's attempt to demonstrate pretext is unsuccessful.

In light of the dearth of evidence suggesting discrimination and Howard's own admission that he has no reason to suspect that racial bias influenced those who were interviewed about the incident or conducted the investigation, *see* Doc. 53-1 at 18, Howard has fallen short of his burden to demonstrate that HMMA's stated reason for its employment action is pretextual.  This leads to the conclusion that, even if Howard had successfully established a *prima facie* case of race discrimination, his claim would fail at the *McDonnell-Douglas* burden-shifting stage.   Therefore, summary judgment on Howard's Title VII claim is due to be granted in favor of HMMA.[9]

---

[9] Because the court concludes that Howard's claim fails on the merits, it makes no recommendation on the resolution of HMMA's contentions that any potential recovery accruing to Howard is limited by after-acquired evidence or Howard's physical inability to work. *See* Doc. 52 at 20–21.

## V.  CONCLUSION

For the reasons stated above, the undersigned Magistrate Judge RECOMMENDS that the motion for summary judgment (Doc. 51) be GRANTED, and that all claims asserted by Plaintiff Ponce D. Howard be DISMISSED with prejudice.

The undersigned further RECOMMENDS that HMMA's Motion for Leave to Supplement its Evidentiary Submission (Doc. 61) be GRANTED, and that the objections contained in the motion to strike (Doc. 62) be SUSTAINED in part and OVERRULED in part, as set forth herein.

It is further ORDERED that the parties are DIRECTED to file any objections to the report and recommendation not later than **August 1, 2017**.  Any objections filed must specifically identify the findings in the Magistrate Judge's report and recommendation to which the party is objecting.  Frivolous, conclusive, or general objections will not be considered by the District Court.   The parties are advised that this report and recommendation is not a final order of the court, and therefore, is not appealable.

Failure to file written objections to the proposed findings and recommendations in the Magistrate Judge's report and recommendation shall bar the party from a *de novo* determination by the District Court of issues covered in the report and recommendation and shall bar the part from attacking on appeal factual findings in the report and recommendation accepted or adopted by the District Court, except upon grounds of plain error or manifest justice. *See Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982); *Stein v. Reynolds Secs., Inc.*, 667 F.2d 33 (11th Cir. 1982).

DONE this 18th day of July, 2017.

_____
GRAY M. BORDEN
UNITED STATES MAGISTRATE JUDGE